## BROWN v. SEARLS.  (No. 191–3242.)

(Commission of Appeals of Texas, Section B. March 2, 1921.)

1. Appeal and error ⊚⟲171(1)—Case will be disposed of on appeal on theory of trial court.

Where the action was tried below solely as one for breach of contract, it will be so disposed of on appeal.

2. Fraud ⊚⟲59(3)—Value of property conveyed in exchange element of damage.

In an action for damages for deceit in a transaction whereby stock of goods was exchanged for plaintiff's lands, the value of the property conveyed by plaintiff is a necessary element in ascertaining the damage.

3. Vendor and purchaser ⊚⟲46—Where executed, the rights of the parties are to be governed by the contract, regardless of infirmities.

Where a trade of land for a stock of goods was consummated pursuant to a written contract between plaintiff and defendant, the contract must be treated as the measure of the parties' rights and liabilities, regardless of its infirmities.

4. Vendor and purchaser ⊚⟲82—Plaintiff vendor held not to have acquiesced in defendant's marking up price of goods for exchange.

Where a stock of goods was to be traded for land at the actual "cost and carriage," and plaintiff, the landowner, consented to taking the goods at the prices marked by defendant, who otherwise refused to proceed, the agreement not to go behind the marks, supposedly previously made in good faith, did not prevent plaintiff from recovering where defendant shortly before the trade marked up the stock of goods.

5. Vendor and purchaser ⊚⟲49—Plaintiff taking stock of goods in exchange for land entitled to recover where defendant removed a large portion in bulk.

Where a contract for the exchange of land for a stock of goods provided that defendant owner of the stock might reduce it by sale at retail, he was not justified in removing a large portion in bulk for the purpose of decreasing the value for trade purposes, and, where plaintiff consummated the exchange in ignorance of such removal, he may recover damages.

6. Vendor and purchaser ⊚⟲331—Findings held to show that vendor was damaged approximately, $2,000.

In action for breach of contract to exchange defendant's stock of goods for plaintiff's land, where defendant marked up the cost price and removed a portion of the stock, findings held to show that plaintiff was damaged, $2,092.

Error to Court of Civil Appeals of Sixth Supreme Judicial District.

Action by H. L. Brown against John W. Searls. Judgment for plaintiff was reformed by the Court of Civil Appeals so as to reduce the amount of the recovery (204 S. W. 495), and plaintiff brings error. Reversed, and judgment rendered for plaintiff.

Miller & Miller, of Athens, Ormand & Simkins, of Corsicana, for plaintiff in error.

Richardson & Watkins, of Athens, for defendant in error.

McCLENDON, P. J. This action was brought by H. L. Brown against John W. Searls to recover damages growing out of a contract under which Brown conveyed a tract of land to Searls in exchange for a stock of merchandise owned by the latter. The trial was by jury upon special issues, and resulted in a judgment in favor of plaintiff for $2,400. This judgment was reformed by the Court of Civil Appeals so as to reduce the amount of plaintiff's recovery to $500. 204 S. W. 495.

[1, 2] The allegations of plaintiff's petition are perhaps sufficient to sustain an action, either for breach of contract or in tort for deceit; but it seems evident that the trial court regarded the action as one for breach of contract only, since no question was pro-

pounded to the jury requiring a finding upon the issue of fraud or the value of the land conveyed by plaintiff, the latter being a necessary element in estimating the damage in an action for deceit under the rule in George v. Hesse, 100 Tex. 44, 93 S. W. 107, 8 L. R. A. (N. S.) 804, 123 Am. St. Rep. 772, 15 Ann. Cas. 456. We will therefore treat the case as an action for breach of contract.

Thus viewed, the only question for determination is whether the evidence and jury findings will support a judgment for a greater amount than that allowed by the Court of Civil Appeals.

We will state the evidence necessary to a clear understanding of this question.

The contract between plaintiff and defendant was in writing and was executed on January 25, 1915; plaintiff agreeing to convey to defendant 320 acres of land at $26 per acre, from which was to be deducted an incumbrance of $1,480, which defendant was to assume; and defendant agreeing to pay for the land by transferring to plaintiff a certain stock of dry goods at "cost and carriage" or "so much thereof as may be necessary to pay for the said land." Defendant reserved the right to refuse to consummate the deal on or before February 20, 1915. The contract contained the further provisions:

"It is further agreed to and understood by the parties hereto that said Jno. W. Searls will continue to sell at retail goods out of said stock, and to buy and replenish same as he may deem proper, but to reduce the said stock of goods so as that same will not be in excess of or largely exceed the value of said tract of land.

"The said Jno. W. Searls further agrees to so manage the further sale of goods from said stock that at the time of transfer of same to said H. L. Brown said stock of goods will be as good and salable a stock of goods then as same now is, and that, if said H. L. Brown is not at that time satisfied that same is as good and as salable a stock as same now is, he will be permitted to decline to further proceed with said sale. In such event, however, the said Brown agrees to settle with Paul Jones for 2½ per cent. commission in effecting this agreement and contract."

The contract did not define "cost and carriage" or furnish a method for its ascertainment; but it seems clear from the subsequent dealings of the parties and their testimony at the trial that this expression was used with reference to the "cost mark" which was placed upon the several articles at the time they originally became a part of the stock, the amount of which was arrived at by taking a certain percentage, which, when added to the original invoice, was estimated to represent approximately the cost of the articles up to the time of their actual delivery in the store. This, we think, is the method usually employed in estimating the amount which the expression is used to signify. It would not be practical, if indeed possible, to ascertain the exact amount of the "carriage" upon each article going to make up a stock of general dry goods.

After the contract was made, but before it was consummated, Searls withdrew a portion of the stock in bulk, and placed it in another building; and he caused the "cost mark" upon part of the stock remaining to be raised. His explanation for so doing was that the withdrawal was for the purpose of reducing the stock to approximately the agreed value of plaintiff's equity in the land, and that the "cost mark" was raised so as to offset what he had subsequently discovered to have been a false representation on plaintiff's part as to the actual value of the land.

The negotiations attendant upon the final consummation of the trade began on February 15, 1915, and lasted several days. The point in controversy between the parties during these negotiations was whether the defendant in placing the "cost mark" on the stock had used the proper basis in estimating the "carriage." The upshot of these negotiations was that plaintiff finally agreed to accept the stock as marked. An inventory was then taken which totaled $10,500. and, after some further parleying, plaintiff took a two-thirds interest in the stock at inventory value ($7,000) in exchange for his land, and formed a partnership with one Osborne, who purchased from defendant the remaining one-third interest.

The material issues upon which the evidence conflicted were whether plaintiff knew before the trade was closed that a part of the stock had been removed or that the "cost mark" had been raised.

The questions propounded to the jury and their answers were the following:

"Was the exchange of property shown to have been made in this case made under the written contract sued on? A. Yes.

"Assuming that plaintiff received $7,000 worth of merchandise, as shown by the inventory, a part of which had been removed, what would the inventory have amounted to had it not been removed? A. $11,200.

"Assuming that there was $4,200 worth of merchandise taken by defendant from his stock of goods and placed in the Spencer-Collins storeroom, what per cent. of the original cost and carriage was the entire stock of goods worth with the $4,200 remaining? A. 60.

"What per cent. of the original cost and carriage was the remaining merchandise worth after said $4,200 worth of merchandise had been removed? A. 30.

"Did the defendant, John W. Searls, in his storehouse, in the presence of Mr. Condit, Jeff Searls, Tom Dickerson, or either of them, inform the plaintiff, Brown, on or about the 15th day of February, A. D. 1915, in substance, that he would not go further with the contract unless he (Brown) would agree to take the goods at the price at which he had marked them? Answer 'Yes' or 'No.' A. Yes.

"Did the plaintiff, Brown, after information that the goods were not marked at cost and

carriage, go ahead and make the trade anyway? Answer 'Yes' or 'No.' A. No.

"State how much you find from the evidence that Tom Dickerson and Jeff Searls marked up the goods above the price at which they were already marked for sale by the defendant Searls. A. $400; $100.

"Did the plaintiff, Brown, have information before the trade was finally closed between himself and defendant, Searls, that the goods were put to him at a higher price than 'cost and carriage,' and did he after such information agree to take the said goods? Answer 'Yes' or 'No.' A. No.

"Did the plaintiff, Brown, after the sale of goods to himself and Osborne, and after he had discovered that a part of the goods had been removed, and after he discovered that the goods were marked up, continue to use the name of defendant, Searls, in his business, and did he continue to confer with the defendant, Searls, and obtain his advice and assistance in the conduct of his business? Answer 'Yes' or 'No.' A. No.

"Did the plaintiff, Brown, believe before he made the final settlement with defendant that the prices of the goods to be taken by him were higher than 'cost and carriage'? Answer 'Yes' or 'No.' A. Yes.

"Did the plaintiff, Brown, and the defendant, Searls, finally agree that the defendant would take the land at the price named, $8,320, and the plaintiff, Brown, would take the goods at the price at which they were then marked, and was the trade finally made on these terms? Answer 'Yes' or 'No.' A. Yes.

"When plaintiff closed the trade by accepting the goods and delivering his deed, did he then know that the goods had been marked up higher than cost and carriage? A. No.

"And did he then know that a part of the merchandise had been taken out of the stock and carried to the Spencer-Collins building? A. No."

Defendant's several assignments of error in the Court of Civil Appeals question the sufficiency of the jury findings and evidence to support a judgment for plaintiff upon substantially the following contentions:

(1) That the original contract was not binding in law, and could not therefore be the basis of an action for damages, because it gave to either party the right to abrogate it.

(2) That the original contract was eliminated as a factor in determining liability by the jury finding that the trade was not consummated upon the contract basis of "cost and carriage" for the stock, but upon the figures at which the stock was actually marked.

(3) That breach of contract could not be predicated upon the removal of a part of the stock by Searls, because he had the right under the contract to reduce the stock to the agreed valuation of plaintiff's equity in the land.

(4) That the only remedy for breach of the contract in the particulars complained of was that provided by the contract itself, which was for plaintiff to decline to proceed further with the sale "if he was not satisfi-

ed with the value and salability of the stock."

(5) That the jury finding that plaintiff before closing the trade believed the goods were marked higher than actual "cost and carriage" eliminated the issue of actionable fraud.

[3] We regard it unnecessary to a proper disposition of the case to consider what would have been the binding effect of the written contract had either party refused arbitrarily to carry it out. It is a consistent deduction from the evidence that, while the parties throughout their dealings appear to have fully recognized the right of each to refuse to consummate the trade, neither of them ever exercised that right, but that the trade was finally closed upon the basis of, and with reference to, the contract as originally made. Whatever, therefore, may have been the infirmities of the written contract, its terms, when the trade was closed, became the measure of the parties' rights and obligations.

[4] The fact, as found by the jury, that defendant told plaintiff he would not go further with the contract unless plaintiff would agree to take the goods at the marked price, is not inconsistent with this conclusion. As we have already seen, the contract left open the method of arriving at the actual "cost and carriage," and the parties seem to have assumed that the marks placed upon the goods were at least an attempt to represent that figure. The agreement not to go behind the marks upon the goods merely eliminated any controversy which might arise in this regard.

The agreement thus reached, however, referred, we think, to the cost marks originally and presumably fairly placed upon the several articles at the time they became a part of the stock, and had no reference to those marks, which had been raised after the contract was made, and without plaintiff's knowledge, for the admitted purpose of offsetting an inflation, actual or supposed, in the trade value placed upon plaintiff's land.

[5] Nor did the contract warrant a removal by defendant of a large part of the stock in bulk in order to reduce the amount to approximately the trade value of the land. The method provided by the contract for reducing the stock was that defendant was to "sell at retail."

We are further of the view that by accepting the stock plaintiff did not preclude himself from recovering the actual damage occasioned by this unauthorized removal. The provision of the contract which permitted plaintiff to refuse to accept the stock if he was not satisfied as to its quality and salability had reference to the stock reduced in the manner provided by the contract, and had no reference to the stock reduced by removal in bulk of a large portion of it without plaintiff's knowledge.

Whether this removal was fraudulent is clearly immaterial. It was only necessary

that it constitute a breach of the contract and result in substantial damage to plaintiff.

[6] Under the findings of the jury, which we think have ample support in the evidence, plaintiff contracted for and was entitled to receive for his land an interest in the stock amounting to $6,820 at "cost and carriage," as shown by the original cost mark placed on the goods when they became a part of the stock, the market value of which was found to be 60 per cent. of this original cost mark, or $4,092. What he actually received was a two-thirds interest in a stock which, after deducting the amount ($500) by which the original cost marks had been raised, inventoried $10,000, the marked value of which was found to be 30 per cent. of the original cost mark, or $2,000. Plaintiff's net loss was therefore $2,092.

We conclude that the judgments of the district court and Court of Civil Appeals should be reversed, and judgment rendered in favor of plaintiff, Brown, for $2,092, with legal interest from January 20, 1915. The costs of the Court of Civil Appeals should be borne by plaintiff; all other costs by defendant.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.